**AUSTIN POWER, INC., Successor to Austin Building Company**

v.

**INSULATION SERVICES, INCORPORATED.**

No. CA 3–75–0006–C.

United States District Court,
N. D. Texas,
Dallas Division.

March 26, 1979.

James C. Tubb and Robert A. McCulloch, Vial, Hamilton, Koch, Tubb, Knox & Stradley, Dallas, Tex., for plaintiff.

Harold Hoffman, Wynne & Jaffe, Dallas, Tex., for defendant.

MEMORANDUM OPINION

WILLIAM M. TAYLOR, District Judge.

This diversity civil action presents a dispute between a contractor, Austin Power, Inc., the Plaintiff, and a sub-contractor, Insulation Services, Inc., the Defendant. Plaintiff is a Texas corporation with its principal place of business in Texas, and

Defendant is a Louisiana corporation with its principal place of business in Oklahoma. Plaintiff has sued for over $800,000 in damages, and Defendant has not challenged the amount in controversy. Therefore the Court concludes that it has jurisdiction.[1]

Plaintiff contends that it contracted with Defendant for Defendant's services in connection with the installation of insulation on a power project that Plaintiff has built for a third party, Texas Electric Service Company ("Tesco"). Defendant contends that there was never a meeting of the minds so that a Court could find the concurrent mutual assent necessary for a contract. The Court concludes that Plaintiff has not carried its burden of proof and proven a contract.

## I.

During the summer of 1972, Tesco contacted Plaintiff about an addition to its plant at Handley, Texas. This building project was to be similar to a couple other projects that Plaintiff had completed for Tesco. Plaintiff in turn contacted Defendant and a couple other insulation sub-contractors about doing the insulation work on the Handley project. Defendant was told that the scope of the work would be comparable to the prior project built by Plaintiff which Defendant had also been the insulation sub-contractor for.

Defendant then submitted a proposal dated October 1, 1972, for the Handley project to Plaintiff. This proposal was signed by a vice-president of Defendant, Norman Shields.

Tesco then sent a letter to Plaintiff dated November 9, 1972, that was, at most, sort of an acceptance of Plaintiff's bid for the Handley project.[2] In turn, Plaintiff sent Defendant a short letter dated November 13, 1972, that is set out in pertinent part in the margin.[3]

In January of 1973, Plaintiff forwarded the final general and special conditions and other revised work papers to all of the sub-contractors that it had sent letters to in November announcing its intent to enter into a sub-contract with. On the 30th day of that month, Mr. Fernandez, President of Plaintiff, had a meeting with Mr. Shields and asked him: "Do you have any problems with the drawings and information we have sent you?" Mr. Shields' response was "No." They did discuss at that time a minor difference in the Handley project from the prior projects which would require additional work to be performed by Defendant.

1. The Court bifurcated the trial on the merits upon the request of the parties and, therefore, will only rule upon the liability issues in this opinion.

2. That letter said:
"This is to inform you that your bid proposal to Texas Electric Service Company, dated November 1, 1972, covering construction of our Handley Units # 4 and # 5, has been received and it is our intention to enter into a contract with your company for the construction of these units.
Your proposal is accepted as a firm lump sum bid based on your general experience and knowledge of the ultimate work involved in this type of construction; however, we acknowledge your offering to us is based on verbal discussion with our engineering staff, preliminary plans, specifications, and contract documents provided by Gibbs & Hill, Inc., and subsequent additions and modifications to the contract documents as transmitted to you in a letter, dated October 23, 1972, from Mr. W. G. Case to Mr. M. R. Traylor.

Therefore, the details of this offer, if accepted by you, will be superseded by a definitive agreement, and the legal rights and obligations of the parties shall be dependent upon and shall only derive from such final contract.
Plans, specifications, and contract documents now being prepared, are expected to be completed by December 31, 1972. We further expect to achieve mutual agreement on such contract during January, 1973.
This Letter of Intent is issued with the understanding that if the parties are unable, in good faith, to subsequently agree on the terms and conditions of the definitive agreement, negotiations will thereby cease, with no incurred costs due to either party."

3. "We forward herewith copy of Letter of Intent we have received from Texas Electric Service Company for this project.
This is to advise it is our intention to enter into a contract with you for insulation under the terms and conditions of Texas Electric Service Company's Letter of Intent to us.
We look forward to working with you."

About April 1, 1973, Tesco and Plaintiff entered into a formal written agreement as contemplated in the November 9, 1972, letter. The agreement was back-dated to March 1, 1973, though, as Plaintiff had already been on the job site before April 1, 1973.

On April 2, 1974, Plaintiff sent a purchase order to Defendant with myriad terms and conditions contained in it. At least several of these were different from those contained in the bid submitted by Defendant to Plaintiff. This purchase order which Plaintiff intended to be the contract between it and Defendant when accepted by Defendant contained the following pertinent conditions:

> "This Purchase Contract constitutes an offer on the part of the Buyer and does not accept the terms and conditions of any prior communications between the Buyer and Seller. Acceptance of this offer may only be made on the exact terms and conditions contained herein. Buyer hereby objects to any different or additional term or condition proposed by Seller."

In the intervening year between April, 1973, and April, 1974, Mr. Fernandez and Mr. Shields had negotiations over clarifications of the work involved that were contained in newer drawings and over increasing material costs.

The April 2, 1974, purchase order contemplated that Defendant would commence work on the Handley project about January 1, 1975, and complete it before December 31, 1976.

On May 8, 1974, Mr. Shields unexpectedly died. Following Mr. Shields' death, other officers of Defendant looked into the projects that Mr. Shields had been responsible for, notified Plaintiff of Mr. Shields' death and the review of his projects.

In June of 1974, Defendant informed Plaintiff that it was not accepting the purchase order dated April 2, 1974. Subsequently, the parties entered into negotia- tions which fell through and ultimately this suit was filed.

## II.

■ Based upon this history the Court finds and concludes two things. First, Plaintiff has not shown a meeting of the minds between these two parties. Second, the Statute of Frauds [4] is applicable and enforceable in this case.

Throughout the many months between the time when Plaintiff initially approached Defendant and the time when they realized they were in hopeless disagreement, there was no instant when the two parties were in agreement. There were two concrete offers put forward by the parties: the initial proposal by Defendant and the purchase order by Plaintiff.

The proposal was not accepted by Plaintiff. Instead, Plaintiff sent the November 13, 1972, letter of intent to Defendant. After the "terms and conditions" of Tesco's November 9, 1972, letter of intent are incorporated, it is clear that Plaintiff did not intend to accept Defendant's proposal but to embark on further negotiations which would hopefully lead to a binding written contract. And, of course, Plaintiff's purchase order was essentially rejected as it was the trigger that led to the present dispute and lawsuit. No real meeting of the minds has been shown by Plaintiff.

It is hornbook law that the Statute of Frauds was enacted in order to avoid situations like the present one. We have a plaintiff contractor suing a defendant subcontractor for some $800,000 in damages and asking a court to piece together a contract from this snippet of testimony and that unsigned document. The courts are well aware that their job is not always an easy one. But in this instance the legislatures have enacted a public policy, the Statute of Frauds, to aid the courts in their decision making.

■ The Statute of Frauds is a defensive matter which the present Defendant has

4. V.T.C.A., Bus. & C. § 26.01.

plead. There can be little dispute but that the present purported contract comes within its purview. The April 2, 1974, purchase order shows that it was intended that Defendant perform its services from January, 1975, until December, 1976, a term substantially in excess of one year.

So the question arises whether or not there is an agreement or memorandum of the purported contract in writing signed by someone authorized by Defendant to do so? This question must be answered in the negative. The only memorandum or agreement of any possible contract between the parties which was signed on behalf of Defendant was the original October 31, 1972, proposal. But, as discussed before, it was not accepted by Plaintiff. Also, the April 2, 1974, purchase order clearly rejected this proposal and any other term or condition not expressed in the purchase order itself.

■ Plaintiff's last remaining hope is that it can fit under the rule announced by the Supreme Court of Texas in *"Moore" Burger, Inc. v. Phillips Petroleum Company*.[5] This rule is known as promissory estoppel. In the context of the Statute of Frauds, this may most simply be stated as the enforcement of the Statute of Frauds will not be allowed to work a fraud.

In *"Moore" burger*, the Defendant was alleged to have promised to reduce a purported contract to writing at a later date. This allegation was held to be sufficient to take the contract out of the Statute of Frauds.

Of course, there has been no contract proven in the present case. Also, no showing has been made that Defendant agreed to reduce anything to writing at a later date. Defendant did submit a complete written proposal to Plaintiff. Plaintiff did not accept it or make a counter-proposal in 1972. Plaintiff did offer to enter into further negotiations and, when they were completed, to then enter into a written contract. The January, 1975, discussion between Mr. Fernandez and Mr. Shields does not show that Defendant agreed to reduce any contract to writing. All it shows is that which is on its face; Mr. Shields had no problems with the "drawings and information." There is nothing else in the record which would indicate even colorably that Defendant agreed to reduce anything to writing at a later date.

■ As a last note, the Court finds that this is not a case where a contract-can be implied by the actions of the parties.[6] The Statute of Frauds is one reason. Also, to do so would be to fly in the face of the words used by the parties. If Plaintiff had chosen to use other words than it did in the letter of intent or purchase order, the outcome of this litigation might be different. But that is only speculation. Plaintiff was free to use what words it wished to and is necessarily bound by them.

Judgment will be entered for the Defendant with costs assessed against the Plaintiff. Defendant's attorney is requested to prepare and submit an appropriate form of judgment.

---

**5.** 492 S.W.2d 934 (1972; reh. den. 1973).

**6.** *Haws and Garrett General Contractors, Inc. v. Gorbett Bros. Welding Co.*, 480 S.W.2d 607 (Tex., 1972).